**SEMNAR & HARTMAN, LLP**
Babak Semnar, Esq. (SBN 224890)
Bob@SanDiegoConsumerAttorneys.com
Jared M. Hartman, Esq. (SBN 254860)
Jared@SanDiegoConsumerAttorneys.com
Laurel N. Holmes, Esq. (SBN 308515)
Laurel@SanDiegoConsumerAttorneys.com
41707 Winchester Rd. Suite 201
Temecula, California 92590
Telephone: (951) 293-4187
Facsimile: (888) 819-8230

Attorneys for,
KATHRYN CASEY

## IN THE U.S. DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN CASEY, an individual,<br><br>PLAINTIFF,<br><br>vs.<br><br>SUMITOMO (SHI) CRYOGENICS OF AMERICA, INC.; DAVID DEDMAN: and DOES 1-25,<br><br>Defendants. | Case No.: **'19 CV 0937 CAB BGS**<br><br>COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL FOR:<br><br>**(1)** Wrongful Termination in Violation of Public Policy;<br>**(2)** Retaliation for Reporting and Resisting Illegal Conduct;<br>**(3)** Retaliation for Exercising the Rights of an Employee;<br>**(4)** Discrimination in Violation of FEHA;<br>**(5)** Retaliation for Reporting Sex/Gender Discrimination;<br>**(6)** Intentional Infliction of Emotional Distress; |

**TO THE CLERK OF THE COURT, THE PARTIES AND COUNSEL:**

1.  By this action, PLAINTIFF KATHRYN CASEY ("PLAINTIFF") seeks

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

penalties, damages, restitution, and any other remedies the Court deems just, due to the misconduct committed by the DEFENDANTS as alleged in this Complaint.

## JURISDICTION & VENUE

2.     This action arises out of DEFENDANTS' violations of California Law, over which the U.S. District Court has original jurisdiction pursuant to complete diversity and the amount in controversy exceeding $75,000.00, as required by 28 U.S.C. §1332.

3.     Complete diversity of the Parties in this matter exists because of the following:

a. DEFENDANT SUMITOMO (SHI) CRYOGENICS OF AMERICA, INC. (hereinafter, "DEFENDANT SUMITOMO"), is a company incorporated in the State of Pennsylvania and with its principal place of business in the State of Pennsylvania.  As such, DEFENDANT SUMITOMO is a citizen of the State of Pennsylvania;

b. DEFENDANT DAVID DEDMAN is a resident of the State of Pennsylvania and is, therefore, a citizen of the State of Pennsylvania; and

c. PLAINTIFF is an individual, residing in the County of San Diego, City of Fallbrook, State of California.  PLAINTIFF is therefore a citizen of the State of California.

4.   DEFENDANT SUMITOMO is registered to do business within the State of California, and in fact maintains and operates a physical office located within the City of San Diego, State of California, and maintains an agent registered for service of process in the City of Santa Clara, State of California.

5.   DEFENDANT employed PLAINTIFF to work within its location in the City of San Diego, State of California.

6.   Because all tortious and wrongful conduct occurred while PLAINTIFF worked for DEFENDANT within the City of San Diego, and all injuries

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

PLAINTIFF suffered occurred therein, and because the majority of witnesses reside and are located within the County of San Diego, venue properly lies with this Court in the Southern District of California.

## **GENERAL ALLEGATIONS**

7.  All Defendants are sometimes collectively referred to as "DEFENDANTS", but conduct attributable to only one DEFENDANT or specific DEFENDANTS will be specified by the names above.

8.   The true names and capacities, whether individual, corporate, associate, or otherwise of the Defendants named herein as DOES 1 through 50, are unknown to PLAINTIFF at this time.  PLAINTIFF therefore sues said Defendants by such fictitious names pursuant to § 474 of the California Code of Civil Procedure. PLAINTIFF will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 50 when their names are ascertained.  PLAINTIFF is informed and believes, and based thereon alleges, that each of the DOE Defendants is in some manner liable to PLAINTIFF for the events and actions alleged herein.

9.  At all times herein mentioned, DEFENDANTS were acting within the purpose, course and scope of said agency and/or employment so as to invoke vicarious liability and *respondeat superior* liability among other theories of liability to hold DEFENDANTS liable and responsible for the injuries and damages to PLAINTIFF.

10. PLAINTIFF is informed, believes, and based thereon alleges, that at all times relevant, each DEFENDANT was acting as an agent, joint venturer, and/or alter ego for each of the other Defendants, and each were co-conspirators with respect to the acts and the wrongful conduct alleged herein so that each is responsible for the acts of the other in connection with the conspiracy in such wrongful acts with the other Defendants.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

11. PLAINTIFF is informed, believes, and based thereon alleges, that each Defendant was acting partly within and partly without the scope and course of their employment, and was acting with the knowledge, permission, consent, and ratification of every other Defendant.

12. PLAINTIFF is informed and believes, and therefore alleges, that each of the Defendants was an agent, managing general partner, managing member, owner, co-owner, partner, employee, and/or representative of each of the Defendants and was at all times material hereto, acting within the purpose and scope of such agency, employment, contract and/or representation, and that each of them is jointly and severally liable to PLAINTIFF.

13. PLAINTIFF is informed and believes, and therefore alleges, that each of the Defendants is liable to PLAINTIFF under legal theories and doctrines including but not limited to (1) joint employer; (2) integrated enterprise; (3) agency; and/or (4) alter ego, based in part, on the facts set forth below.

14. PLAINTIFF is informed and believes, and therefore alleges, that each of the named DEFENDANTS are part of an integrated enterprise and have acted or currently act as the employer and/or joint employer of PLAINTIFF making each of them liable for the violations alleged herein.

15. PLAINTIFF is informed and believes, and on that basis alleges, that each DEFENDANT sued in this action, including each DEFENDANT sued by the fictitious names DOES 1 through 100, inclusive, is responsible and liable in some manner for the occurrences, controversies and damages alleged below.

## FACTUAL ALLEGATIONS

16. PLAINTIFF is a woman.

17. At all relevant times, DEFENDANT SUMITOMO and DEFENDANT DEDMAN were aware of PLAINTIFF'S gender as a woman.

18. PLAINTIFF was hired by Ferran Technology on or about January 5,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

2016 as an Office Manager and assigned responsibility for finances, accounting, and human resources.

19. PLAINTIFF was also tasked with overseeing at least two employees for direct reporting purposes.

20. In October 2016, Ferran Technology was bought out by DEFENDANT SUMITOMO, at which point Ferran Technology ceased to exist as a corporation and DEFENDANT SUMITOMO became PLAINTIFF'S employer and kept her job title and job duties.

21. DEFENDANT SUMITOMO has multiple business locations, but the two primary locations involved in this matter are Allentown, PA and San Diego, CA.

22. PLAINITFF was employed by DEFENDANT SUMITOMO in its San Diego office.

23. Eventually, after the change in corporate ownership, the new management team consisted of the following players, among others:

    a. DEFENDANT DAVID DEDMAN – Chief Executive Officer

    b. Ignacio Mercade – Chief Financial Officer as well as
       Secretary/Treasurer

    c. Kenneth Gilson - Controller

    d. Kelly Taylor-Keaveney - Human Resources Manager

    e. James (Jim) Crage - Vice President of Operations

    f. Vasile (Val) Todosi - Director of Operations, San Diego Operation

24. PLAINTIFF was pivotal in producing most of the reporting that was used in discussions leading up to the corporate purchase, as well as all reporting regarding personnel, human resources, finances, spending, and integration during the change in corporate ownership.

25. PLAINTIFF historically was intrinsically involved with managing human resources, issues related to financial activities of the company, purchasing,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

spending, and accounts payable.

26. In fact, PLAINTIFF'S employment record is glowing with positive reviews of her job performance, and it was well known that she was considered one of the most reliable and dependable employees in the day-to-day operations of DEFENDANT SUMITOMO.

27. During the transition from Ferran to SUMITOMO, PLAINTIFF had been identified as one of a handful of "Key Employees" requiring salary increases to set them at a base pay that fairly represented their job descriptions, responsibilities, comparable salaries, and that which would acknowledge their value to the company.

28. Unfortunately, however, PLAINTIFF was eventually viewed as a nagging and complaining woman, and her complaints about legitimate workplace unlawful issues and issues going against company policy were never taken seriously, and as a result she was forced to suffer various adverse employment actions (explained in more detail below), was treated as a pariah, and was excommunicated by the male management team (even though she historically worked closely with the management team and was instrumental in the change in corporate structure), and was ultimately terminated.

29. PLAINTIFF was ultimately treated differently than the male management team members because she was viewed as a nagging woman, as discussed in more detail below, which amounted to not only gender discrimination/differential treatment but also retaliation as a whistleblower and potential whistleblower.

30. Moreover, the new Vice President of Operations, Jim Crage, quickly created a culture of hostility and fear, whereby he would routinely yell and shout and curse at employees and other management, even screaming "fuck" and calling people "dumb fuck" and "fucking idiot" on a regular basis in front of groups of other people, and also treating every other employee with derision and contempt.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

31. The culture was one to where employees are afraid to report any complaints to Jim out of fear of retaliation and retribution, and also out of fear and nervousness of being yelled at and degraded/humiliated publicly.

32. Furthermore, the culture also deteriorated to the point where employees were afraid to report anything to corporate Human Resources, Kelly, out of fear of retaliation from either Allentown or San Diego or both.

33. DEFENDANT DEDMAN, who should have tempered Jim Crage and remedied the culture of hostility, failed to do so.

34. Moreover, DEFENDANT DEDMAN knew about and ratified with full knowledge any and all actions of retaliation and discrimination undertaken by Jim Crage.

35. Shortly after she assisted in implementing the day-to-day changes as a result of the change in corporate ownership to DEFENDANT SUMITOMO, PLAINTIFF became a target of Jim Crage and other executive management, including DEFENDANT DEDMAN, because they saw PLAINTIFF as a nagging woman, a whistleblower, and a threat of potential whistleblower for multiple issues, including, but not limited to, the following:

1) Executives, including DEFENDANT DEDMAN, hiding capital and hiding spending activities from SUMITOMO'S corporate parent company in Japan (known as "Sumitomo Heavy Industries") in order to appear more profitable than it was;

2) Crage sending PLAINTIFF an email with a link to pornography sites and telling her he hopes she will find it to be interesting;

3) PLAINTIFF being on the receiving end of unwanted and unconsented sexual jokes during a company dinner in November 2017 (which ended with the CFO telling PLAINTIFF, "you may want to forget everything you heard here tonight.");

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

4) DEFENDANT SUMITOMO creating a culture of gender discrimination in order to appease and receive approval from the masochistic culture of the Japan parent company;

5) DEFENDANT SUMITOMO operating under unsafe working conditions that posed risks to employee health and safety;

6) PLAINTIFF raising complaints to management about her being treated differently as a woman;

7) PLAINTIFF raising complaints to management about her job being taken away from her and her job duties being stripped as a result of whistleblowing;

8) PLAINTIFF raising complaints to management about how her job has been relegated to simply picking up food and cleaning up after the male executives' lunches;

9) PLAINTIFF raising complaints to management about lack of organization and lack of efficiency in the company operations after her job duties were scaled back to simply picking up food and cleaning up after the male executives' lunches;

10) PLAINTIFF lodging reports and attempting to correct unlawful policies of rounding out hours worked for hourly employees, as opposed to paying them based on hours actually worked, in violation of California Labor Laws;

11) PLAINTIFF raising complaints to management about the Controller (at the direction of and in association with the upper level management team) restricting her access to financial files, financial accounts, financial reports, human resource files, payroll records, and hourly employee timesheets, all of which was done in order to deprive her of discovering more unlawful conduct and violations of company policy

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

that would have ultimately resulted in PLAINTIFF filing more complaints; and

   12) PLAINTIFF lodging reports and resisting violations of company policies.

36. In early 2018, PLAINTIFF was notified by David Ferran, who was retained as a consultant after the transition in corporate ownership, that SUMITOMO'S parent company in Japan has a history and culture of gender discrimination against women, forcing them to suffer disparate treatment and to suffer less opportunities and less financial benefits than males within the company and that the management team of SUMITOMO was likely to follow suit in creating the very same culture of gender discrimination/differential treatment of women. Ferran advised PLAINITFF to attempt to assert her position within the company in order to attempt to earn respect.

37. Thereafter, in February 2018, PLAINTIFF reported to management that she was being treated less favorably as a woman, in part because she was excommunicated from meetings when the Japanese parent company executives visited the worksite.

38. Also, in February of 2018, PLAINTIFF began to point out to executive management discrepancies between the financial analysis reports (which were to be sent to the parent company in Japan so that the executives could justify their capital funding requests from their Japan parent company) as compared to the actual financial activities that she observed in her role as Office Manager.

39. In March of 2018, PLAINTIFF drafted a financial analysis report highlighting the executives' actions at hiding money and hiding spending from the parent company in Japan in order to make the Allentown company appear more profitable.

40. PLAINTIFF was thereafter scolded by the CFO and Controller for the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

details she included in her analysis report about the financial activities and was specifically told that they would continue such financial activities and that she needed to cease her inquiries about the financial discrepancies.

41. Shortly thereafter, PLAINTIFF suffered a falsified performance review that reduced her performance evaluation from a 4 out of 5 to a 3.6 out of 5, because upper level management, including DEFENDANT DEDMAN, directed the San Diego regional location branch to lower her evaluation score in retaliation for her reporting their deception in their financial activities.

42. Upon information and belief, the upper level management, including DEFENDANT DEDMAND, directed her branch to lower her performance evaluation so that her employment file could have negative marks as a means of starting the process of terminating her and denying her any additional raises and bonuses beyond what she had already received up to that point.

43. PLAINTIFF was also instructed by management to edit and alter employee reviews to make the reviews more negative so that those employees would not be entitled to the bonuses that they had been led to believe they would receive based on the positive (truthful) performance reviews.

44. Shortly thereafter, upper level management began to excommunicate PLAINTIFF and limited her job duties to simply picking up food for lunches and cleaning up after the male executives were finished with lunches.

45. Moreover, upper level management stripped her of all other office managerial duties, effectively demoting her and depriving her of career advancement and on the job training/experience and causing her great emotional pain, sadness, and lack of confidence.

46. PLAINTIFF thereafter lodged reports and complaints about her job functions suddenly being restricted, effectively reporting adverse actions taken by executive management to retaliate against her for reporting the issues in February

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and March 2018 above.

47. Also in March 2018, PLAINTIFF lodged a report questioning DEFENDANT SUMITOMO'S policies of rounding out hours worked for hourly employees, as opposed to paying them based on hours actually worked, in violation of California Labor Laws, which resulted in PLAINTIFF being scolded.

48. In April of 2018, hourly employees came to PLAINTIFF to express concern and frustration as to issues related to timecards not calculating hours worked properly, which resulted in them not being paid for hours actually worked.

49. The hourly employees came to PLAINTIFF because she historically had been the person overseeing such day-to-day issues related to office management, and because they trusted her and respected her.

50. PLAINTIFF tried working with one manager to fix these issues in order to rectify the harm done to the hourly employees, but the Senior executive level managers instructed the manager to stop working with PLAINTIFF on this issue.

51. Upon information and belief, DEFENDANT DEDMAN was integral in the decision for the CFO instruction to stop working with PLAINTIFF on this issue.

52. Upon information and belief, the instruction for the manager to stop working with PLAINTIFF on this issue was to cover up the California Labor Law violations of not accurately recording actual hours worked on itemized wage statements and also causing hourly employees to not receive proper compensation according to hours actually worked because by now PLAINTIFF had been identified as a known whistleblower.

53. In May of 2018, PLAINTIFF reported to management that she intended to flush out discrepancies in financial activities and financial reporting, but shortly thereafter she discovered that she was blocked from accessing the identified financial accounts and Jim Crage instructed another manager to "handle" her,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

apparently instructing the manager to alter PLAINTIFF'S working conditions to where she would not be able to continue her efforts at trying to uncover these financial discrepancies.

54. Upon information and belief, PLAINTIFF was blocked from accessing these financial accounts, which she previously had access to, because by now PLAINTIFF had been identified as a known whistleblower and the process was being put into place to terminate her and transition her job duties to someone else.

55. Upon information and belief, the Controller agreed with, followed, and implemented the decision of management, including DEFENDANT DEDMAN, to restrict PLAINTIFF'S previous unrestricted access in order to deprive her of continuing to research and question the financial discrepancies.

56. PLAINTIFF thereafter discovered that she was also blocked from accessing timecards, schedules, paid time off requests, and other information related to schedules and hours worked, all of which she previously had access to as part of her job as Office Manager.

57. Upon information and belief, the Controller agreed with, followed, and implemented the decision of management, including DEFENDANT DEDMAN, to block PLAINTIFF from accessing such information that she previously had access to because by now PLAINTIFF had been identified as a known whistleblower and the process was being put into place to terminate her and transition her job duties to someone else.

58. PLAINTIFF lodged complaints about her being restricted from accessing the financial accounts and schedule-related information whereas she previously had such access as related to her historic job duties, but she was rebuffed and ignored.

59. Ultimately, Val, Director of Operations, agreed with PLAINTIFF that her job duties had been stripped and she was being excommunicated by management

as a result of her inquiries and probing into the financial activities and her reporting of discrepancies.

60. Furthermore, PLAINTIFF had a conversation with the IT manager in the Allentown, PA branch in April 2018 who told her that she needn't worry about the restriction in access because DEFENDANTS were planning to fire her.

61. PLAINTIFF also discovered in June 2018 that someone else had been given the job tasks of approving of purchase orders for office supplies and reviewing/entering/payment of invoices, which were historically part of PLAINTIFF'S job duties, but this transition in task further evidence that the process was being put into place to terminate PLAINTIFF and transition her job duties to someone else.

62. Again, in June, PLAINTIFF lodged more reports and inquiries about discrepancies in financial activities from May and management again instructed her to leave it alone.

63. Also in June 2018, Jim Crage instructed PLAINTIFF to violate company policy and hire his son as a contractor without following the proper channels and obtaining the proper approvals so that his son could start earning an income so that he could move out and not be a financial burden on Jim any more, essentially nepotism.

64. PLAINTIFF attempted to resist this violation of company policy and sent to Jim the protocol for proper vetting and hiring of contractors, which Jim ignored the protocol.

65. Val, the CFO, even informed PLAINTIFF that he would not be able to approve of Jim's request since it was a blatant violation of company policy, but ultimately Jim prevailed and was able to hire his son in blatant violation of company policy.

66. In July 2018, an employee came to PLAINTIFF with concerns that she

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

desired to request either paid time off or paid family leave to help care for a sick family member but she was afraid of retaliation from Jim Crage due to being informed by another employee, Shawn, that a culture of retaliation exists against employees who take such leave.

67. PLAINTIFF attempted to address these concerns with Jim on her behalf, to which Jim snapped and responded that Shawn needed to "keep his fucking mouth shut".

68. In any event, this amounted to another instance of PLAINTIFF attempting to lodge reports and complaints about unlawful and perceived unlawful activities of retaliation against employees for exercising their rights to paid time off and paid family leave.

69. In August of 2018, Jim Crage asked PLAINTIFF to draft an HR complaint against his elderly uncle (RJ Ferran) out of an incident whereby Jim and his elderly uncle were yelling at each other and ultimately resulted in Jim's elderly uncle flipping Jim off and telling Jim he had "better not fire [PLAINTIFF]".

70. PLAINTIFF initially had no idea about this conversation regarding Jim's intentions of firing PLAINTIFF and RJ's objections thereto.

71. PLAINTIFF uttered her confusion at why she was now being asked to perform an HR task after she had been stripped of such job duties over the past few months, and Jim responded by telling her to "not rock the boat".

72. Upon information and belief, Jim informed PLAINTIFF of this conversation and asked her to fill out the HR form as a means of implicitly threatening PLAINTIFF with termination without actually threatening her with termination (since the crux of the incident was RJ telling Jim not to fire PLAINTIFF) and so that Jim could have a basis for instructing PLAINTIFF to "not rock the boat" and thereby instruct her to not lodge any more complaints or reports about unlawful and perceived unlawful conduct.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

73. In October of 2018, Jim instructed PLAINTIFF to act as the go-between between him and RJ to request that RJ give Jim a public apology in front of everyone else, since they had refused to communicate with each other directly since the August incident, and instructed her to email the responses between each other to Jim and CC RJ and several other employees and also non-employee contractors.  It was apparent that Jim's goal was to force RJ to apologize publicly in order to degrade and shame him with submissiveness, and Jim even CC'd multiple people on the email exchanges where he was insisting on such a public apology, even RJ's employees who had no place being involved in such communications, simply as a measure of publicly shaming RJ.

74. Again, as this incident arose from conversations about PLAINTIFF potentially being terminated, upon information and belief, Jim informed PLAINTIFF of this conversation and asked her to act as the go-between as a means of implicitly threatening PLAINTIFF with termination without actually threatening her with termination and so that he could instruct her to not lodge any more complaints or reports about unlawful and perceived unlawful conduct.

75. Later in December 2018, Jim fired RJ (his elderly uncle) and Jim taunted RJ by saying "where's your 'fuck you' now?"  Also around this time, Jim was able to secure approval for terminating the consulting contract held by his cousin, and RJ's son, David Ferran.

76. After RJ was fired and David Ferran's consulting contract was terminated, management ordered the locks on the building be changed.

77. Nobody informed PLAINTIFF that the locks had been changed and nobody gave PLAINTIFF a key to the new locks, despite her title as Office Manager, which further evidenced management's plan to terminate PLAINTIFF as well.

78. During a meeting with Jim in December 2018, PLAINTIFF complained

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

about how she had previously been intrinsically involved in leadership roles and overseeing day-to-day operations but she had since been relegated to simply ordering food and cleaning up managements' lunch trash, Jim then uttered a veiled threat to PLAINTIFF about how RJ was terminated and informed PLAINTIFF that she had taken too many lunches with RJ and that she is now "guilty by association" and instructed her to publicly explain to everyone else in management that she is "on their side, not RJ's".

79. On or about February 14, 2019, a flood occurred outside the building due to heavy rains and leaking occurred inside the building creating hazard for slipping.

80. PLAINTIFF was informed by Tate that Jim yelled at Tate for locking the door to prevent employees from entering and slipping on the wet floors.

81. PLAINTIFF went to Target to purchase non-skid mats.

82. On her way back to the office, the rain had increased to the point that roads were being flooded and prevented ingress/egress to one of only two ways to the building.

83. Police were actively setting up roadblocks at various points approaching the office and even came to the building to direct people to leave early and go home to avoid the risk of being stuck in the building.

84. In an attempt to report the unsafe conditions, PLAINTIFF informed Jim that roads were being closed by the police and that they should start advising employees to head home early for safety reasons.

85. PLAINTIFF suggested that employees be permitted to go home early before the only other road floods and become impassible, which resulting in Jim rejecting the suggestion. Jim informed PLAINTIFF that he was leaving for the airport and he didn't care what people did, and eventually exclaimed to another employee (Tan) that people were just trying to get out of work when Tan

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  questioned why the employees were being forced to stay when the roads were
2  being blocked off and the conditions were quickly becoming a safety hazard.

3      86. When PLAINTIFF informed Jim that the police had already come to the
4  building and stated that people should leave early and go home to avoid the risk of
5  being stuck in the building, Jim replied, "I'm leaving; I don't care".

6      87. PLAINTIFF specifically informed Jim that there existed a source of
7  leaking rain into the building that was creating a safety hazard and urged that she
8  needed a plan to protect employees' safety, to which Jim replied, "I'm leaving; you
9  deal with it" and ultimately left.

10      88. On February 18, 2019, Jim Crage sent an email to PLAINTIFF with a
11  written message in the body of the email that says "hopefully you would appreciate
12  this" and was then followed by a link that directs to pornography sites such as
13  "Angelina Jolie Nude Scene", "Black Girls Eating Pussy", and "Slutload".

14      89. PLAINTIFF never consented to receive any pornographic emails from
15  Jim or anyone else and finds this email to be highly offensive and disturbing.

16      90. On or about February 16 or February 17 of 2019, a flood had occurred
17  inside the building to the point where water was gushing out of the building.

18      91. The property manager found that she was not able to enter the building,
19  because she did not have a key after the building had been rekeyed.

20      92. Luckily, however, another employee was in the building at the time and
21  allowed the property managers in to attempt to control the flood.

22      93. Another employee on site, Patrick, then contacted PLAINTIFF, as
23  PLAINTIFF was known to be the Office Manager and the go-to person for such
24  things.

25      94. PLAINTIFF then contacted another employee (Tan) to come up with a
26  plan for employees' safety, and during this conversation Tan told PLAINTIFF that
27  Jim and Val had instructed Tan to not tell anyone else about the flood (including

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

PLAINTIFF) to not give an incentive for the employees to attempt to stay home on the next business day (February 19th) as a result of the hazardous conditions and so this way all employees would come in to work as usual on the 19th and be forced to help clean up after the flood.

95. On the next business day when everyone was back in the building, February 19th, PLAINTIFF reported to Val that both she and the property manager needed keys to the new locks because, if another employee had not been in the building, then neither she nor the property manager would have either had to break in or be unable to do anything about the flood over the weekend.

96. Val rolled his eyes at PLAINTIFF and walked away and began yelling at people about how they needed to work harder to clean up.

97. During this time, Val was repeatedly complaining about how he was forced to be at the building "babysitting" the employees to ensure their safety while the other executive management team was in another building meeting with the Japan parent company executives.

98. Historically, PLAINTIFF would have been the one tasked with overseeing the employees under such circumstances, but since she was by now being treated as a pariah and her job duties had been relegated to picking up lunches and cleaning up after the male executives, the upper level executive management team refused to allow PLAINTIFF to be the one in charge of the flooded job site because they were afraid she would send the employees home out of concern for their safety and were afraid that she would document and report safety hazards and other OHSA violations.

99. PLAINTIFF also reported to Val and Ignacio (CFO) that the employees were being forced to work in unsafe working conditions that are certainly violations of OHSA safety standards and thereby creating potential legal liability because, among other reasons, the employees were being forced to clean up the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

flood water and flood damage and move furniture around while there were pools of water still on the floors, water actively dripped in from windows around the building, water actively dripped down the walls, and with the walls and floors and furniture still wet, all while there was still several areas of exposed electrical wires creating a very prevalent risk of electrocution, and while employees were being forced to work with the doors open to air out the wet building but which allowed cold air to blow into the wet condition and cause health risks to the wet employees inside, and also forced the employees to work in conditions to where there were no clear lines of escape in case of an emergency since all exits were by now blocked by large and loud industrial fans.

100. It was also actively raining, and employees had to walk in the rain across a parking lot to a shared restroom, shared with other office and construction workers, as it was now the only accessible bathroom, which created safety hazards due to the risk of employees slipping while walking in the pouring rain and also caused risk to PLAINTIFF and the only other female being subject to attack.

101. PLAINTIFF had also began working closely with the property managers so that the flood could be cleaned up and the property could be repaired.

102. However, management, including DEFENDANT DEDMAN, scolded PLAINTIFF for reporting the flood to the property manager and instructed PLAINTIFF (the purported Office Manager) to stop talking to the property manager entirely.

103. The next day, on February 20, 2019, PLAINTIFF again reported to management her concerns for OHSA violations and potential legal liability over the employees' safety, explaining, among other things, that there were no clear paths to exits due to the furniture having been moved around, industrial sized fans everywhere, and water still present, and that the only restroom was now across the parking lot and because it was supposed to rain again PLAINTIFF had concerns

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

about tripping and slipping hazards for employees walking to the restroom across the parking lot in heavy rains, and she relayed that the property managers had the same concerns and had been conveying those concerns to her. PLAINTIFF also informed management that she had photos of the damage and offered to provide them so that management could utilize the photos in their notifications to their parent company and also to use the photographs for insurance purposes, which offer was refused.

104. In response to this complaint and report, PLAINTIFF was scolded by Ignacio and Dave Dedman to stop discussing this and he specifically instructed her not to speak with the property managers anymore at all, effectively cutting PLAINTIFF off as a source of complaints and reports of health and safety hazards at the worksite.

105. Within mere days of PLAINTIFF reporting the unsafe working conditions to management, she was terminated on February 25, 2019.

106. DEFENDANT DEDMAN is the one who gave PLAINTIFF her termination notice.

107. PLAINTIFF'S termination was for false and pretextual reasons.

108. Despite the claimed reasons for her termination, it is clear that such reasons are false and pretextual because while Val watched PLAINTIFF pack her belongings from her office he admitted to PLAINTIFF that her termination was, at least in substantial part, desired and planned by Jim, Ignacio, and DEFENDANT DEDMAN, among others in management, for a long time because of her complaints and reports and that is why management never ordered a new key to the building for PLAINTIFF even though the keys had all been replaced months prior to her termination.

109. As stated above, PLAINTIFF'S complaints were never taken seriously because she is a woman and she was seen as merely a complaining woman who

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

needs to be excommunicated and terminated so that she does not ultimately lodge reports and complaints to the parent company or to Governmental agencies.

110. Therefore, PLAINTIFF was terminated in retaliation for her conduct as a woman whistleblower and also as a threatened whistleblower in order to cover up and prevent PLAINTIFF from further reporting numerous unlawful and perceived unlawful conduct to the parent company or to Governmental agencies.

111. Upon her termination, DEFENDANT SUMITOMO attempted to cover up its own illegal conduct by attempting to bribe PLAINTIFF into signing a Separation Agreement that contained grossly one-sided terms in favor of SUMITOMO including, but not limited to, 1) waiver of claims and release of liability, 2) a representation that PLAINTIFF is not aware of any conduct or activities that could give rise to legal claims or legal violations, and 3) non-disparagement clause.

112. The terms of the Separation Agreement make it clear that DEFENDANT SUMITOMO was actually attempting to buy silence and waivers of liability from PLAINTIFF, which in turn means DEFENDANT SUMITOMO knew about its own legal violations and was desperate to attempt to hide them.

113. As a direct and proximate result of the foregoing actions of DEFENDANTS, PLAINTIFF has suffered emotional distress and mental anguish evidenced by symptoms including, but not limited to, loss of sleep, nervousness, feelings of loss, loss of sense of self-worth, feelings of despair, feelings of hopelessness, sadness, embarrassment, and shame.

114. Furthermore, as a direct and proximate result of the above unlawful actions, PLAINTIFF has suffered, and continues to suffer, loss of wages, expenses, loss of business opportunity, loss of career advancement, and loss of earnings in amount yet ascertained, but subject to proof at trial in amounts in excess of the minimum jurisdiction of this Court.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

115. PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANTS have engaged in other illegal and wrongful acts, which are currently unknown to PLAINTIFF.  Upon discovery of such acts, PLAINTIFF will amend this complaint to allege these unknown illegal and wrongful acts and omissions committed by DEFENDANTS.

116. PLAINTIFF has exhausted her administrative remedies under the California Fair Employment and Housing Act and received a Notice of Case Closure/Right-to-Sue Letter from the Department of Fair Employment and Housing on May 20, 2019, allowing PLAINTIFF to sue DEFENDANTS.

### FIRST CAUSE OF ACTION
**Wrongful Termination in Violation of Public Policy**
**(Against all DEFENDANTS)**

117.   PLAINTIFF repeats, re-alleges, and incorporates by reference the foregoing allegations as though set forth fully herein.

118.   "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170.

119.   California Labor Code, including, but not limited to, Section §1102.5, recognize a fundamental public policy interest in all employees being free from threats and coercion for disclosing information that they reasonably believe discloses a violation of state or federal law or regulation, and free from threats, incitement, and coercion to endure or suffer illegal activities as a part of their job duties, in order to protect the California workforce as a whole.

120.   PLAINTIFF complained and reported multiple issues of unlawful conduct of DEFENDANTS, including, but not limited to, the executive management attempting to hide money and spending activities from the parent

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

company, unsafe working conditions and potential OHSA violations, and issues with payroll not paying hourly employees properly, among others.

121.   DEFENDANTS also perceived PLAINTIFF as a potential threat of reporting these such unlawful issues to regulatory/governmental agencies, to the parent company, and also perceived PLAINTIFF as a potential threat for reporting various other unlawful conduct and violations of company policy, including but not limited to gender discrimination/differential treatment and Crage sending an email to PLAINTIFF with a link to pornography sites, among others.

122.   DEFENDANTS terminated PLAINTIFF in an attempt to prevent her from further reporting any such illegal actions.

123.   DEFENDANTS' attempt to cover up these illegal actions is confirmed by the grossly one-sided Separation Agreement that attempted to buy PLAINTIFF'S silence and waiver of claims.

124.   DEFENDANTS' discharge of PLAINTIFF was wrongful because it violated the public policy of the State of California to prohibit employers from coercing or intimidation employees to perform, tolerate, or abide by illegal activity and to allow employees to work in a workplace where they can feel free to report illegal and potentially illegal activities.

125.   DEFENDANTS' intentional conduct towards PLAINTIFF constitute a wrongful termination in violation of public policy, deserving of all remedies to protect the public from similar wrongs, including but not limited to economic damages, emotional distress damages, loss of use, liquidated and statutory damages.

126. As a direct and proximate result of the foregoing actions of DEFENDANTS, PLAINTIFF has suffered emotional distress and mental anguish evidenced by symptoms including, but not limited to, loss of sleep, nervousness, feelings of loss, loss of sense of self-worth, feelings of despair, feelings of

hopelessness, sadness, embarrassment, and shame.

127. Furthermore, as a direct and proximate result of the above unlawful actions, PLAINTIFF has suffered, and continues to suffer, loss of wages, expenses, loss of business opportunity, loss of career advancement, and loss of earnings in amount yet ascertained, but subject to proof at trial in amounts in excess of the minimum jurisdiction of this Court.

128. DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.

129. To the extent that any violations of the above cause of action is based upon the conduct of executives, managers, and supervisors, DEFENDANT SUMITOMO knew about such conduct and ratified such conduct, and did so with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights.

## SECOND CAUSE OF ACTION
### Retaliation for Reporting and Resisting Illegal Conduct
California Labor Code §1102.5
**(Against all DEFENDANTS)**

130. PLAINTIFF repeats, re-alleges, and incorporates by reference the foregoing allegations as though set forth fully herein.

131. This cause of action is based on California Labor Code section 1102.5, including but not limited to, subsection §1102.5(b) which prohibits "an employer, or person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, […] if the employee has reasonable cause to believe that the information discloses a violation of state or

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation[.]" Cal. Labor Code § 1102.5(b)

132.   Additionally, based upon the Labor Code provision that, "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Labor Code § 1102.5(c).

133.   PLAINTIFF complained and reported multiple issues of unlawful conduct of DEFENDANTS, including, but not limited to, the executive management attempting to hide money and spending activities from the parent company, unsafe working conditions and potential OHSA violations, and issues with payroll not paying hourly employees properly, among others.

134.   DEFENDANTS also perceived PLAINTIFF as a potential threat of reporting these such unlawful issues to regulatory/governmental agencies, to the parent company, and also perceived PLAINTIFF as a potential threat for reporting various other unlawful conduct and violations of company policy, including but not limited to gender discrimination/differential treatment and Crage sending an email to PLAINTIFF with a link to pornography sites, among others.

135.   DEFENDANTS terminated PLAINTIFF in an attempt to prevent her from further reporting any such illegal actions.

136.   DEFENDANTS' attempt to cover up these illegal actions is confirmed by the grossly one-sided Separation Agreement that attempted to buy PLAINTIFF'S silence and waiver of claims.

137.   DEFENDANTS' discharge of PLAINTIFF was wrongful because it violated the public policy of the State of California to prohibit employers from coercing or intimidation employees to perform, tolerate, or abide by illegal activity and to allow employees to work in a workplace where they can feel free to report

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

illegal and potentially illegal activities.

138.  DEFENDANTS' intentional conduct towards PLAINTIFF constitute a wrongful termination in violation of public policy, deserving of all remedies to protect the public from similar wrongs, including but not limited to economic damages, emotional distress damages, loss of use, liquidated and statutory damages.

139. As a direct and proximate result of the foregoing actions of DEFENDANTS, PLAINTIFF has suffered emotional distress and mental anguish evidenced by symptoms including, but not limited to, loss of sleep, nervousness, feelings of loss, loss of sense of self-worth, feelings of despair, feelings of hopelessness, sadness, embarrassment, and shame.

140.  Furthermore, as a direct and proximate result of the above unlawful actions, PLAINTIFF has suffered, and continues to suffer, loss of wages, expenses, loss of business opportunity, loss of career advancement, and loss of earnings in amount yet ascertained, but subject to proof at trial in amounts in excess of the minimum jurisdiction of this Court.

141.  DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.

142.  To the extent that any violations of the above cause of action is based upon the conduct of executives, managers, and supervisors, DEFENDANT SUMITOMO knew about such conduct and ratified such conduct, and did so with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights.

143.  Additionally, PLAINTIFF prays that each and every retaliatory act by DEFENDANTS, through the acts of its agents, and managers, is subject to, "in

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section." Cal. Labor Code § 1102.5(f).

### THIRD CAUSE OF ACTION
**Retaliation for Exercising Rights of an Employee**
**Cal. Labor Code §98.6**
**(Against all DEFENDANTS)**

144. PLAINTIFF repeats, re-alleges, and incorporates herein the information set forth in the preceding paragraphs, as though fully set forth and alleged herein.

145. "A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter[…] because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her." 98.6(a).

146. Additionally, the employee "shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer." 98.6 (b)(1).

147. "In addition to other remedies available, an employer who violates this section is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation of this section." 98.6 (b)(3).

148. PLAINTIFF exercised her right as an employee to report multiple issues of unlawful conduct of DEFENDANTS, including, but not limited to, the executive management attempting to hide money and spending activities from the parent company, unsafe working conditions and potential OHSA violations, and issues with payroll not paying hourly employees properly, among others.

149. DEFENDANTS terminated PLAINTIFF in an attempt to prevent her

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

from further reporting any such illegal actions.

150. DEFENDANTS' attempt to cover up these illegal actions is confirmed by the grossly one-sided Separation Agreement that attempted to buy PLAINTIFF'S silence and waiver of claims.

151. As a direct and proximate result of the foregoing actions of DEFENDANTS, PLAINTIFF has suffered emotional distress and mental anguish evidenced by symptoms including, but not limited to, loss of sleep, nervousness, feelings of loss, loss of sense of self-worth, feelings of despair, feelings of hopelessness, sadness, embarrassment, and shame.

152.   Furthermore, as a direct and proximate result of the above unlawful actions, PLAINTIFF has suffered, and continues to suffer, loss of wages, expenses, loss of business opportunity, loss of career advancement, and loss of earnings in amount yet ascertained, but subject to proof at trial in amounts in excess of the minimum jurisdiction of this Court.

153. DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.

154. To the extent that any violations of the above cause of action is based upon the conduct of executives, managers, and supervisors, DEFENDANT SUMITOMO knew about such conduct and ratified such conduct, and did so with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights.

///

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## FOURTH CAUSE OF ACTION
### Discrimination in Violation of FEHA
### Cal. Labor Code §12940 et al.
### (Against all DEFENDANTS)

155.  PLAINTIFF repeats, re-alleges, and incorporates herein each paragraph set forth above as though fully set forth and alleged herein.

156. This cause of action is based on DEFENDANTS' Violation of the Fair Employment and Housing Act, including but not limited to California Government Code section 12940(a) et al., which prohibits employers from discriminating against employees based on their gender or sex.

157. PLAINTIFF is and at all times was a woman.

158. DEFENDANTS were on notice of PLAINTIFF'S gender/sex.

159.  DEFENDANTS discriminated against PLAINTIFF by perceiving her as a nagging woman, with such discriminatory acts including, but not limited to, stripping of PLAINTIFF'S job duties to where she ultimately did nothing more than order lunches and clean up after the male executives were finished eating, excommunicating her, depriving her of job experience and career opportunities, and ultimately terminating her.

160. Ultimately, DEFENDANTS terminated PLAINTIFF'S position for refusing to acquiesce to the ongoing discrimination and retaliation.

161. DEFENDANTS' attempt to cover up these illegal actions is confirmed by the grossly one-sided Separation Agreement that attempted to buy PLAINTIFF'S silence and waiver of claims.

162. DEFENDANTS violated California Government Code Section 12940, et seq. by doing the above described acts, including but not limited to, terminating PLAINTIFF'S position, due to her gender/sex.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

163. As a direct and proximate result of being subjected to DEFENDANTS' discrimination due to PLAINTIFF'S sex/gender, PLAINTIFF suffered emotional distress.

164. Further, as a direct and proximate result of all of the foregoing actions taken towards PLAINTIFF as alleged herein, PLAINTIFF has incurred economic injury, including loss of earnings and benefits in an amount not yet ascertained, losses in salary, wages, job benefits, health insurance, and other employment benefits which he would have received from DEFENDANTS, to be ascertained according to proof.

165. DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.

166. To the extent that any violations of the above cause of action is based upon the conduct of executives, managers, and supervisors, DEFENDANT SUMITOMO knew about such conduct and ratified such conduct, and did so with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights.

## FIFTH CAUSE OF ACTION
**Retaliation for Reporting Sex/Gender Discrimination**
**Cal. Labor Code § 12940(h)**
**(Against all DEFENDANTS)**

167. PLAINTIFF repeats, re-alleges, and incorporates herein each paragraph set forth above as though fully set forth and alleged herein.

168. This cause of action is based on DEFENDANTS' Violation of the Fair Employment and Housing Act, including but not limited to California Government

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Code section 12940(h) which prohibits employers from retaliating against employees who report or resist sex/gender discrimination.

169. PLAINTIFF notified DEFENDANTS that she was subjected to sex/gender discrimination and differential treatment as a woman while employed with DEFENDANTS.

170. DEFENDANTS discriminated against PLAINTIFF by perceiving her as a nagging woman, with such discriminatory acts including, but not limited to, stripping of PLAINTIFF'S job duties to where she ultimately did nothing more than order lunches and clean up after the male executives were finished eating, excommunicating her, depriving her of job experience and career opportunities, and ultimately terminating her.

171. Ultimately, DEFENDANTS terminated PLAINTIFF'S position for refusing to acquiesce to the ongoing discrimination and retaliation.

172. DEFENDANTS' attempt to cover up these illegal actions is confirmed by the grossly one-sided Separation Agreement that attempted to buy PLAINTIFF'S silence and waiver of claims.

173. DEFENDANTS violated California Government Code Section 12940, et seq. by doing the above described acts, including but not limited to, terminating PLAINTIFF'S position, due to her gender/sex.

174. As a direct and proximate result of being subjected to DEFENDANTS' discrimination due to PLAINTIFF'S sex/gender, PLAINTIFF suffered emotional distress.

175. Further, as a direct and proximate result of all of the foregoing actions taken towards PLAINTIFF as alleged herein, PLAINTIFF has incurred economic injury, including loss of earnings and benefits in an amount not yet ascertained, losses in salary, wages, job benefits, health insurance, and other employment

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

benefits which he would have received from DEFENDANTS, to be ascertained according to proof.

176. DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.  To the extent that any violations of the above cause of action is based upon the conduct of executives, managers, and supervisors, DEFENDANT SUMITOMO knew about such conduct and ratified such conduct, and did so with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF'S rights

## SIXTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all DEFENDANTS)

177.   PLAINTIFF repeats, re-alleges, and incorporates herein by this reference the allegations in the foregoing paragraphs, as though set forth herein.

178.   DEFENDANT DEDMAN, acting on behalf of DEFENDANT SUMITOMO, was instrumental in the decision and implementation of adverse actions and gender discrimination/differential treatment of PLAINTIFF as a perceived nagging woman, with such adverse actions including, but not limited to, stripping of PLAINTIFF'S job duties as an adverse action to where she ultimately did nothing more than order lunches and clean up after the male executives were finished eating, excommunicating her, and ultimately terminating her.

179.   DEFENDANT SUMITOMO knew of, and ratified, the actions of DEFENDANT DEDMAN.

180.   The conduct outlined above was outrageous and cannot be tolerated in a civilized society.

181.   DEFENDANTS' misconduct, as identified above, was done with the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

intent to cause emotional distress or with reckless disregard of the high probability of causing PLAINTIFF emotional distress.

182.   As a direct, foreseeable, and proximate result of the DEFENDANTS' conduct, PLAINTIFF has suffered and endured severe emotional distress and will continue to suffer severe and permanent emotional distress including, but not limited to, humiliation, mental pain, and anguish, hyper vigilance, panic attacks, anxiety, depression, and will continue to live in a constant state of emotional tension and distress.

183.   As a direct and proximate result of the DEFENDANTS, and each of their actions, PLAINTIFF is informed and believes, and based thereon alleges, that PLAINTIFF has suffered severe and serious damages to her earning potential and business prospects, in an amount to be proven at trial.

184.   DEFENDANTS' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure PLAINTIFF and in conscious disregard of PLAINTIFF's rights, which entitles PLAINTIFF to exemplary and/or punitive damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for judgment against each DEFENDANT individually, and that PLAINTIFF be awarded the following:

1. That the Court find that the conduct of each of DEFENDANTS described above was done with oppression and malice, and that any conduct of PLAINTIFF'S supervisors and managers were ratified by those other individuals who were managing agents of DEFENDANT SUMITOMO; that these unlawful acts were further ratified by DEFENDANTS, and were done with a conscious disregard for the PLAINTIFF'S rights and with the intent, design and purpose of injuring the PLAINTIFF; and that, by reason thereof, the PLAINTIFF is entitled to punitive or exemplary damages

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

against said Defendants, and each of them, for their acts as described in this cause of action in a sum to be determined at the time of trial;

2. For penalties, special damages, and general damages in an amount to be proven at trial;

3. For emotional distress damages;

4. For punitive damages as allowed by law;

5. Loss of income incurred and to be incurred according to proof;

6. Loss of use of income;

7. Injunctive relief in the type and manner deemed appropriate by the Court, such as mandatory training for supervisors;

8. For statutory damages;

9. For civil and statutory penalties pursuant to the California codes;

10.     For prejudgment interest at the legal rate;

11. That PLAINTIFF be awarded costs and reasonable attorneys' fees; and

12. Such other and further relief as the Court may deem proper and just.

## TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, PLAINTIFF is entitled to, and demands, a trial by jury.

Dated:  May 20, 2019                    **SEMNAR & HARTMAN, LLP**

By: *Jared M. Hartman*
_____,
Jared M. Hartman, Esq.
Attorneys for Plaintiff,
KATHRYN CASEY

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a)  PLAINTIFFS**
KATHRYN CASEY, an individual,

**DEFENDANTS**
SUMITOMO (SHI) CRYOGENICS OF AMERICA, INC.; DAVID DEDMAN: and DOES 1-25,

**(b)**   County of Residence of First Listed Plaintiff   San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
SEMNAR & HARTMAN, LLP; 41707 Winchester Rd. Suite 201; Temecula, California 92590; PH 951-293-4187

Attorneys *(If Known)*

'19CV0937 CAB BGS

**II.  BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*                                             Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V.  ORIGIN** *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Remanded from Appellate Court
☐ 4  Reinstated or Reopened
☐ 5  Transferred from Another District *(specify)*
☐ 6  Multidistrict Litigation - Transfer
☐ 8  Multidistrict Litigation - Direct File

**VI.  CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332--complete diversity jurisdiction
Brief description of cause:
Whistleblower retaliation; gender/sex discrimination; wrongful termination

**VII.  REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
750,000.00
CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

**VIII.  RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE
DOCKET NUMBER

DATE
05/20/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Jared M. Hartman, Esq.

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.